Hillsborough, }
    June, 1899. }

LINTOTT, *Adm'x*, v. NASHUA IRON AND STEEL CO.

In an action for negligence against an employer, certain evidence considered sufficient to warrant a submission to the jury of the question whether the injury to the plaintiff's intestate arose from dangers incident to the service which he knew and appreciated, or would have known and appreciated in the exercise of ordinary care.

CASE, for negligence causing the death of the intestate, John Lintott. Trial by jury. The testimony tended to prove the following facts:

The defendants are manufacturers of car axles and heavy forgings. They have several shops, containing blast-furnaces, trip-hammers, and other machinery operated by power transmitted by means of shafting, pulleys, and belts.

John Lintott, while in the defendants' employ, was killed, February 24, 1898. He was nearly twenty-two years old, and of average mental capacity. In the afternoon of that day, by direction of the defendants' superintendent, he was assisting one McQuade at his work at a lathe in the northeasterly corner of

the west hammer-shop. One of the belts, upon which the lathe depended for the transmission of power, parted, and it became necessary to lace the ends together. In a southerly direction from the lathe there was a shaft four inches in diameter, running from a point near the easterly end of the shop and seventeen feet and eight inches above the floor, toward the west. There were five fixed iron pulleys upon the shaft, each having a hub and rim with spokes between. The first pulley, counting from the east, was eighteen inches in diameter and sixteen inches wide, the second thirty-four inches in diameter and sixteen inches wide, the third and fifth forty-two inches in diameter and nine inches wide, and the fourth seven inches in diameter and eight inches wide. The distance between the third and fourth pulleys was fourteen inches, and between the fourth and fifth an inch more or less,— the distance between the inside faces of the third and fifth being twenty-one inches. The second pulley was secured to the shaft by a spline, and the third and fourth by two set-screws inserted through each end of the hub at a distance of about an inch inside the face of the pulley. The screws were on one side of the hub and about four inches apart, and had heads seven eighths of an inch square, which projected one inch above the surface of the hub. Belts six inches in width ran from the third and fifth pulleys in a southerly direction to a blower used in connection with a furnace. A belt three and one half inches wide ran from the fourth pulley in a northerly direction to a pulley on a counter-shaft from which power was taken to run the lathe, and this was the belt that parted. A platform about three feet three inches wide was suspended by iron rods from the timbers above, at a distance of two feet eight inches below the shaft, for use when oiling the bearings, repairing the belts, etc. The means of lighting the building and the obstructions to the passage of light were such, and there was so much smoke and dust in the air, that it was "pretty dark" at and in the vicinity of this line of shafting. When the shaft was in motion the set-screws in the pulleys could not be seen from the floor of the building, and it is doubtful if they could be seen from the platform. About three o'clock in the afternoon Lintott went upon the platform, by direction of McQuade, to assist one Cullen (whose duty it was to mend belts, and who had previously been upon the platform for that purpose several times) in lacing the belt that had parted. Lintott had never been there before, nor, so far as appeared, had he ever assisted in such work. In obedience to Cullen's direction, he stood upon the platform opposite the fourth pulley, about two and one half feet from the shaft, facing the third pulley, and held one end of the belt with his right hand in such a manner that it formed a loop around the shaft seven or eight inches wide about midway of the fourteen-

inch space between the third and fourth pulleys. The belt passed from Lintott's hand to Cullen, who sat at Lintott's feet near the northerly edge of the platform, with his feet hanging down and his back toward the third pulley, and was lacing the ends of the belt together. The shafting and pulleys were in motion, making about 225 revolutions in a minute. The only special directions given to Lintott were " to hold the heft of the belt off the shaft," and to " be sure and hold it on the plain piece of shaft," — that is, the fourteen inches between the third and fourth pulleys. Cullen testified that the belt might touch the shaft without danger if its weight was kept from the shaft, but, if not, the belt was liable to " crawl" lengthwise of the shaft. Three or four minutes after they had taken their positions, the belt was suddenly drawn from Cullen's hands, and Lintott was snatched from the platform, carried around the shaft, and killed. The belt was wound around the hub of the third pulley, inside, over, and outside the set-screws, on the end toward the place where Lintott stood, and around the adjacent shafting. A piece of cloth torn from Lintott's clothing was found in the coils of the belt around the shaft.

Lintott had been in the employ of the defendants, off and on, three or three and a half years, with the exception of a period of nine to twelve months prior to March, 1897, during which, and also prior to his employment by the defendants, he worked upon a farm. The first year or two he worked in the yard shoveling coal, assisting teamsters in handling heavy articles, and doing other work of a similar kind. After this, he was " gate boy " for a large trip-hammer in the east hammer-shop used in welding scraps of iron together to form large bars. A lever controlled the transmission of power to the hammer, and his duty was to move the lever back and forth as directed by the men who were doing the forging. There was no shafting near this hammer. He also assisted in cutting off the ends of axles and centering them, with the use of lathes. In such cases the axles were raised on to the lathe by a tackle, and, after being secured at each end, were cut off and centered. It was Lintott's duty to look after one end of the axle while the man in charge looked after the other end. The lathes were driven by belts running over pulleys upon shafting located some fifteen feet above the floor on which the lathes stood. One of the lathes at which he thus assisted had a shaft with a pulley secured to it by two set-screws through the hub of the pulley on each side. There were also two collars, each secured to the shaft by a set-screw. These screws had square heads projecting above the surface five eighths to three fourths of an inch, or a little less. While Lintott was at work upon this lathe, the man in charge of it called his attention to one of the set-screws near a bearing, which, on that account, was

particularly dangerous, and told him to be careful when oiling the bearing.

Lintott sometimes oiled the bearings of a line of shafting suspended near the beams of the east shop, having a dozen pulleys upon it. The belts having been shipped to the fixed pulleys, he went upon planks resting upon the beams of the building, reached down through an opening between the planks four or five inches in width, and oiled the bearings of the shafting and the hubs of the loose pulleys. There was a line of shafting near one end of the same shop, the bearings of which he oiled while standing upon a ladder placed against the end of the shop. The pulleys upon these shafts were mostly small, fourteen to fifteen inches in diameter, and all or nearly all of the fixed pulleys were secured to the shafting by set-screws having projecting square heads. There was other shafting in the shops, located some fifteen feet above the floors, carrying pulleys fastened in the same way.

Lintott's work in connection with the trip-hammer and with the lathes was not constant, but there were intervals of a day or a week, more or less, in the same,— the former extending through a period of a year perhaps, and the latter through a period of two or three months. When not at work upon these machines, he worked about the yard as a common laborer.

At the close of the plaintiff's testimony a nonsuit was ordered, subject to exception.

*George B. French* and *Jeremiah J. Doyle,* for the plaintiff.

*Charles W. Hoitt, Burnham, Brown & Warren,* and *John H. Riedell,* for the defendants.

CHASE, J. The defendants do not deny that they knew or ought to have known of the danger incident to the service to which Lintott was assigned. Their defence is, that he also knew of and fully appreciated it, or would have known of and appreciated it if he had exercised ordinary care, and consequently that he assumed the risk to which he was subjected. He was not specially instructed concerning the dangerous machinery in the immediate vicinity of the place where his service was to be rendered, but the defendants say that the machinery was within the range of his vision, and its dangerous character was so obvious that a man of his age, capacity, and experience needed no instruction. The plaintiff, on the other hand, says that the danger was concealed, and Lintott was not fully aware of it, and could not have discovered it by the exercise of due care. The plaintiff's exception raises the question whether there was any evidence from which it could properly be found that Lintott did

not know of and fully appreciate the danger to which he was exposed, or was not chargeable with such knowledge and appreciation. *Paine* v. *Railway*, 58 N. H. 611.

Everybody must agree that Lintott knew he was very near to a shaft and pulleys that were revolving with great rapidity, and that he was liable to be injured if he came in contact with them. But such knowledge would not acquaint him with the full extent of the risk to which he was exposed. The danger was very greatly increased by his hold upon the belt, encircling the shaft within a few inches of the third pulley and its projecting set-screws. He was instructed " to hold the heft of the belt off the shaft," but was not told that if he failed to do so the belt was liable to " crawl " toward the pulley. It did not appear that .he knew of this fact. It was not obvious, nor a matter of common knowledge. There was nothing in his previous experience in the defendants' shops which conclusively showed that he had seen belts " crawl " under such circumstances. Knowledge of the fact would naturally have stimulated him to exercise greater care. It was necessary to a full appreciation of the risk he was incurring. Cullen knew of the liability of a belt to crawl under such conditions. He assigned Lintott to the service, and in so doing represented the defendants. *Jaques* v. *Company*, 66 N. H. 482. The question whether he should not have instructed Lintott about this liability is a proper one for the consideration of a jury.

There was another element of danger which it is doubtful if Lintott knew about, or could have discovered by the exercise of ordinary care, namely, the existence of the set-screws with projecting heads within six or eight inches, more or less, of the belt which he was holding. The facilities for seeing them were not favorable. The place was " pretty dark," and the pulley with its set-screws was making about 225 revolutions. a minute. Whether he ought to have inferred that they were there from the knowledge he had of the way in which other pulleys in the shops were secured to shafting, was a question about which fair-minded men might differ. Some might think he had had no occasion to observe set-screws in pulleys, except in the instance when he was cautioned to be careful in oiling a bearing near one, and that the fact that he was then cautioned would lead him to understand that he would be specially cautioned whenever he was exposed to a similar danger; while others might think that a man of his age and capacity, having such opportunities for observation, must have learned of the method so generally adopted by the defendants for securing pulleys to shafting. Cullen's direction " to be sure and hold the belt on the plain piece of shaft " did not necessarily imply that any danger would arise from a failure to comply with it, other than such as was obvious from

the proximity of the revolving pulleys. It did not necessarily call attention to the presence of the set-screws and the danger incident to them. Lintott may have understood that the direction was given for Cullen's convenience rather than his own safety,— that such a position of the belt was required to enable Cullen to lace it properly and quickly. Moreover, the belt that was liable to crawl and the projecting set-screws were within a few inches of each other. Each aggravated the danger ordinarily incident to the other. The evidence bearing upon Lintott's knowledge of his surroundings and appreciation of his danger is not so definite and controlling that a jury might not properly find that they were not sufficient under the rules of law to charge him with the risk of injury.

The evidence also tended to show that the injury resulted in whole or in part from these dangerous instruments. The belt was suddenly drawn from Cullen's hands, and Lintott was snatched from the platform and carried around the shaft. After the accident it was found that the belt was coiled about the hub of the pulley and the shaft, inside, over, and outside the set-screws, and a piece torn from Lintott's clothing was confined in the coils. Apparently, the belt began to wind around the shaft and hub before Lintott's clothing was caught in it and he was snatched from the platform. The crawling of the belt seven or eight inches to one side and its entanglement with the heads of the set-screws would account for its being suddenly drawn from Cullen's hands and wound around the hub and shaft. Lintott's hold of the belt and proximity to the shaft and pulley would account for his being caught by the coils of the belt and drawn upon the shaft. There being evidence that was not conclusive as to these questions, they should have been submitted to the jury. *Demars* v. *Glen Mfg. Co.*, 67 N. H. 404, 406.

*Exception sustained : nonsuit set aside.*

PEASLEE, J., did not sit: the others concurred.